**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>-against-<br><br>RUBEN MORCIGLIO<br><br>Defendants. | 18-CR-873 (S-1) (VSB) |

# DEFENDANT RUBEN MORCIGLIO
# SENTENCING MEMORANDUM

Kenneth J. Montgomery, Esq.
Law Offices of Kenneth J. Montgomery, PPLC
198A Rogers Avenue
Brooklyn, New York 11225
(718) 403-9261

*Attorney for Ruben Morciglio*

## I.     Preliminary Statement

Defendant Ruben Morcigliio respectfully submits this sentencing memorandum in support of his request for a sentence at variance with his designated sentencing guideline range of 360 months to life. The Defendant has previously plead guilty to three counts on the superseding indictment. A guideline sentence of 360 months to life, if given, would ensure that the Defendant will likely spend the rest of his life in prison, and is a declaration that Ruben Morciglio is incapable of redemption or reflection. The Supreme Court has mandated that each defendant is guaranteed an individualized sentence, one that takes into consideration each defendant's unique life circumstances and personal narrative. The context and nuances of Ruben Morciglio's life opens a doorway to understanding and appreciating mitigation, and explains how a young man only 33 years of age finds himself guilty of such serious charges, and possibly facing spending the rest of his life in prison. When those life circumstances and mitigation are analysed together along with the crime, a sentence at variance of (120) months satisfies congress' goal that the sentence imposed is "sufficient, but not greater than necessary" to achieve the objectives of 18 U.S.C. § 3553(a).

## II.     Standard of Review

In light of the Supreme Court's decision in <u>United States v. Booker</u>, 543 U.S. 220 (2005), and the Second Circuit's decision in <u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005), the Court imposes a sentence after considering all of the factors identified in 18 U.S.C. § 3553(a), including the Advisory Guidelines.  To that end, the court considers:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –

>    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...;
>
> (5) any pertinent policy statement [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

The court finds all of the facts appropriate for determining a sentence, whether that sentence is a Guidelines sentence or not. Crosby, 397 F.3d at 114-15. A sentencing court "has broad latitude to 'impose either a Guidelines sentence of a non-Guidelines sentence.'" United States v. Rigas, 583 F.3d 108, 114 (2d Cir. 2009) (citation omitted). Ultimately, the court's statutory responsibility requires it "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." Kimbrough v. United States, 522 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)). Ruben Morciglio respectfully submits that these factors, on balance, are satisfied with a sentence of time served.

## III. Introduction

Society often fails to recognize the complexities of trauma and what happens when it goes unchecked and untreated. Trauma is the common thread that binds the individuals involved in this indictment together; both Victims and Ruben Morciglio. Trauma is the driving force regarding what happened to both the victims and the Defendant. The trauma sustained by Ruben is directly connected to his conduct in the indictment. Both the victims and Ruben have been deeply scarred by sexaul abuse and violence. Psychological trauma is an affliction of the powerless[1]. At the moment an individual sustains trauma, the victim is rendered helpless by an overwhelming force. Traumatic events overwhelm the ordinary systems of care that give people a sense of control, connection, and their life meaning. In 1980, when post-traumatic stress disorder was first included in the diagnostic manual, the American Psychiatric Association described traumatic events as events that were "outside the range of usual human experience." At the time of the inclusion I doubt that many experts were considering how a life in urban poverty contributed to the analysis when compounded by abuse. Traumatic events are extraordinary, not because they occur rarely, but rather because they tend to overwhelm the ordinary adaptations to everyday life. Sometimes the ordinary adaptations of life are themselves so dysfunctional that they are actually synonymous with trauma. Traumatic events and environments confront human beings with the extremities of helplessness and terror, and evoke the responses of catastrophe, often stripping the human spirit of hope and the ability to make quality life decisions. According to the *Comprehensive Textbook of Psychiatry*, the common denominator of psychological trauma is a feeling of intense fear, helplessness, loss of control,

---

[1] See Trauma and Recovery -The Aftermath of Violence-From Domestic Abuse to Political Terror by Judith Herman, M.D.

and the threat of annihilation. When that trauma is compounded with sexual abuse and mental health issues, and a dysfunctional and exploitive environment living in poverty, that trauma is only heightened. The trauma becomes even more complex when transferred from one generation to the next without it being addressed. The severity of such trauma becomes multi-dimensional, playing itself out in a multitude of ways during the course of an individual's life.

Each stage of Ruben Morciglio's life during his early developing stages as a child and teenager have been impacted with some degree of trauma and includes sexual, mental, and physical abuse. That trauma has greatly affected Ruben's ability in developing a healthy mind, spirit and value system. These traumatic events and environmental conditions have produced profound and lasting changes in Ruben's development as a healthy young man. Family history, sexual assault, poverty, drug addiction, and violence have all contributed deeply to Ruben's life perspective. His life was deprived of the ability to develop a healthy process to judge and discern, and has also worked to stunt his development as a functional young man in society; thus creating a crisis of values and a tormented life. Such a harrowing childhood placed his self preservation at a very young age on high alert, evoking a feeling that danger might return at any given moment. Ruben's rough life has called into question his understanding and appreciation of basic human relationships. The difficulties of his life have breached the usual glue that affords an individual comfort and safety, that glue being family, friendship, and community. Difficult life circumstances can sometimes operate to distort one's sense of safety in the world. From a very early age Ruben felt abandoned and alone, cast out of the normal human structures of care and protection to sustain life and left to fend for himself in an environment that afforded him very little free and autonomous choices.

The ultimate sentencing issue in this case is: How much if any does Ruben's life and background warrant a variance if any from a possible life sentence. Clearly, the sentence requested by the Government and recommended by Probation would mean that Ruben will likely die in prison or return home as a senior citizen.

## IV.   **Background**

As trial attorneys, we are impacted and educated to the narrative of our client's lives as we embark on the difficult challenge of advocating on behalf of those who are often at the bottom of American society. Social, political, and economic alienation for those at the bottom of society is systemic, institutional and overwhelming. I was the second attorney assigned to represent Ruben Morciglio. From my very first encounter with Ruben I was able to discern that he was a young man who had sustained a difficult life from a very early age. Obviously I was unaware of the details of his life in our first encounter. However, his mannerisms and body language during that first meeting, represented to me a bright young man that society likes to refer to as "damaged goods". During the course of my representation of Ruben I now understand those details, and how they played a causal and correlative relationship to his criminal conduct. There is an old cliche that says "if you want to figure a kid out, then just follow them home". During that journey you will also get to see the circumstances and environment that they are reared in.

Ruben's lack of positive adjustment in this world started before he was born, and begins with his parents. Ruben's mother Samantha Kwok was violently raped as a teenager in her native Puerto Rico, by a teenager in the neighborhood named Angel. As a result of the rape Samantha was impregnated by her rapist, and as if the trauma of being violently raped wasn't enough, Samantha's grandmother and Angel's father had arranged for Samantha and Angel to marry so that Angel could avoid prison.  It was a marriage in name only, however, it left Samantha humiliated and degraded. After she delivered her child she was sent back to the United States. Samantha's relationship with her grandmother was further strained because of her grandmother's mental illness. While Samantha was happy to leave  Puerto Rico to escape the man who had violently raped her, once in New York, she entered into an abusive and exploitative relationship with Ruben's father, Carlos Morciglio. Like most abusive relationships, her and Carlos' relationship started out smoothly but quickly became abusive. For years Carlos Morciglio would mentally, physically, and sexually abuse Ruben's mother without any accountability. Despite the abuse they had two more children after Ruben was born. Despite the abuse, Samantha would reconcile with Carlos only to be repeatedly abused again.  Ruben's first childhood memory is of him walking into his parent's bedroom and observing his mother yielding sexually to his abusive father. That image, as well as his belief that his mother was passively accepting of his father's abuse were emotionally conflicting for young Ruben. Ruben's observation was not only disturbing but it imposed on him the possibility at a young age that this type of behavior was acceptable and would later become normalized in Ruben's own life and in the details of this indictment.

Another one of Ruben's most vivid childhood memories is of his mother's head getting smashed with a glass fishbowl by his father. This type of abuse by his father towards his mother became a normal occurrence at home until Ruben and his siblings were old enough to stick up for their mother and after his father's last period of incarceration before his death from colon cancer in 2012. This type of repeated exposure to violence gives credence to research that shows childhood exposure to domestic violence increases the risk for mental, emotional, social, and behavioral difficulties for a child. Ruben was a victim of secondary trauma as he witnessed his father abuse his mother. Those behavioral difficulties can often result in depression, anxiety, anger issues, and poor social relationships, which are very evident in Ruben's development. Children like Ruben and his siblings who witness domestic violence are very likely to be the victims themselves of physical and sexual abuse. They themselves face a higher risk for emotional and psychological maladjustment. Samantha would do her best to raise Ruben and his siblings by herself as Carlos Morciglio battled his demons. Several of her children including Ruben would follow in their father's footsteps in regards to prison, drug addiction, and abuse. The stressors of trauma, poverty and violence would end up taking a terrible toll on Samantha's mental and physical health. Ms. Kwok is currently disabled and suffers from a host of physical ailments including; breast cancer, heart disease, high blood pressure, brain tumor and Type 2 diabetes. Despite her health issues she still enjoys a loving relationship with Ruben, who was her caretaker prior to this last imprisonment.  Ms. Kwok shares a special bond with her son because of their shared traumatic experiences. A lengthy sentence would increase the likelihood that his mother with her many health issues may die while Ruben is in prison. Samantha's hope is that her son can learn from his mistakes and return from prison a better man before she dies.

Carlos Morciglio died in 2012, from colon cancer and other health issues stemming from a lifelong addiction to both crack and heroin. Carlos Morciglio would spend a significant amount of time incarcerated for drug arrest and drug related crimes, crimes like larceny, burglary and criminal sale which are often indicative of drug abuse. His presence in his children's lives was sporadic, dysfunctional and violent. The New York State Corrections records show three felony convictions and upstate time for Carlos Morciglio. Most of those convictions involved Carlos attempting to support his drug addiction to both heroin and crack cocaine. Carlos created an environment in which illicit drug activity and substance abuse became a normal part of Ruben's childhood and adult life. In fact the normalized drug use of his father and the financial instability and trauma of his mother Samantha, paved the way for the substance abuse that Ruben would indulge in as a teen-ager and adult. Ironically, Ruben would eventually reconcile and resume a somewhat positive relationship with his father after his father's last stint in prison, however his father would soon die just as Ruben and him were forming a bond. His father's death made Ruben surmise that it's never too late to change for the better, but his death left another gaping hole in Ruben's life.

Carlos' limitations exposed Ruben's vulnerability at home and in his Bronx neighborhood. Ruben's environment put him at risk for developmental delays in education that would go unaddressed throughout his entire educational history. These risk factors included but were not limited to, lower than average outcomes for health, education, job opportunities, and socio-economic advancement. The generational trauma transferred from Samantha's family combined with an abusive and drug addicted father was just the beginning of Ruben's trauma. Ruben's early toddler and childhood years were also filled with unattended and untreated trauma.

As a toddler an ACS investigation was started when Ruben fell out of his stroller and suffered a fractured skull while with his mother. As a result Ruben was removed from his mother's home and placed in the custody of his maternal aunt for a short period of time. Ruben's mother believes that the head injury contributed to his developmental issues and his learning difficulties in school. For example Ruben never received the educational help to help address his academic challenges. For example, while in the third grade Ruben tested in the 11th percentile for reading which was well below the 57th percentile which was average for 3rd graders at the time. Samantha reports that during a psychoanalysis evaluation at 12 years old Ruben was diagnosed with Bipolar disorder and a history of ADHD. However, the financial constraints of the family and lack of resources prevented Ruben's mother from getting him the necessary help.

Ruben's trauma continued to compound itself at an early age. As a child Ruben was repeatedly sexually assaulted by a family member. Ruben's behavioral and educational issues increased after the sexual abuse by his uncle, Alex Martinez. Both Ruben and his younger brother Joshua, who is also currently incarcerated, were repeatedly sexually assaulted by Alex. Alex, a known pedophile amongst the family, was allowed around the children in the family with no care or suspicion, until his death from HIV/Aids. Alex would lure Ruben and the other children in the family with toys and video games. None of the adults in the family paid attention or reported the abuse when they finally were made aware. Ruben's cousin Pablo describes Ruben's life perfectly- he states that "the conditions Ruben faced at home were too abusive to

expect him to grow up without emotional scars, Ruben got the rough end of the stick". Pablo described Ruben as fun loving and family oriented, but slow mentally and eager to seek the approval of others. That analysis would make Ruben very vulnerable in his rough and tumble neighborhood, where peer pressure to do the wrong thing was a constant force.

Ruben's neighborhood included the 52nd precinct. During Ruben's teenage years, the years when a young man is most impressionable, Ruben was in the street with compounded trauma and no supervision, and no positive male presence or role models. During that period crime was trending downward in most areas of the Bronx and all across the city, however crime remained high in Ruben's neighborhood. During Ruben's teenage years he was also obese and often bullied because he was considered mentally slow and overweight. To make matters worse, at 14 Ruben sustained serious injuries to both of his hips due to a car accident that required major surgery and a long stay in Jacobi hospital. He still suffers from those injuries as an adult. His siblings stated that the multitude of challenges beyond his control made Ruben very angry. They also stated that he became very self conscious, and developed a desire to fit in to avoid being picked on. That desire to fit in was a very dangerous personality trait considering the tough neighborhood that Ruben was raised in.

Despite all of Ruben's limitations and risk factors, Ruben felt that the "street" and illicit criminal activity was the only place that he could provide for himself, his mother and his siblings. After all, that was what his father had reinforced and normalized from a very young age. An unfortunate and common trap that poverty and dysfunction creates, and many damaged and impressionable young men like Ruben fall victim to. At the time because of the failures of his father and his mother unable to carry the load all alone the family had become dependent on welfare and section 8 housing.

Ill prepared and lacking the skill set to assume the role of head of the household, Ruben felt he had no choice but to assume the role of provider and protector for his family as his mother dealt with her health issues and his father continued to spiral into his addiction, and in and out of prison. The pressure associated with having to assume such a role for which he clearly lacked the maturity or resources contributed to the pattern of poor choices and legal consequences in Ruben's life. Ruben's criminal history began at a young age and reflects his lack of parental supervision, complex dysfunction, poverty and trauma. The men in Ruben's community responsible for nurturing him into adulthood actually nurtured him into illegal activity and subjected him to physical and sexual abuse. By his adolescence and teenage years Ruben was fully exposed to poverty and the criminal elements in his neighborhood and began adapting to street influences, which became an integral part of his survival and his world. As serious as the charges are in this indictment, they highlight the degradation of poverty and dysfunction and how they play a part in destroying a community. Both the victims and Ruben are the results of a broken community. When a community is broken to such a degree, the details in this indictment become normalized. The deterioration of Ruben's home life and community rendered him helpless with no safety net to address his developmental challenges and history of mental illness and dysfunction; much in the same way that the community in the lives of these young victims in this indictment had failed them as well. The community actually paved the way for Ruben's criminality and participation in this indictment. Studies show that the kind of risk factors that

Ruben was exposed to as a child often culminate in that child becoming a proponent of violence. It isn't surprising at all that Ruben sought to self medicate and sought criminality as a way of life.  See United States v. Bannister, 786 F. Supp.2d 617, 653 (E.D.N.Y. 2011) (Weinstein, J.) ("With the father absent and the mother working, many ghetto children spend the bulk of their times on the streets . . . of a crime-ridden, violence-prone and poverty-stricken world. The image of success in this world is not that of the 'solid citizen,' the responsible husband and father, but rather that of the 'hustler' who promotes his own interests by exploiting others. The dope sellers . . . are the 'successful' men because their earnings far outstrip those [of] men who try to climb the economic ladder in honest ways.") (quoting The Kerner Report: The 1968 Report of the National Advisory Commission on Civil Disorders 267, 262 (Pantheon 1988)).

Because of the instability and dysfunction in Ruben's life, his first encounter with the criminal justice system began when he was only 16 years of age. Those encounters would increase with frequency and by the age of 18 he was already arrested four times. Imagine the prospects of a young teenager growing up in poverty with a battered and overwhelmed mother, and drug addicted father in and out of prison. Ruben's prospects for a meaningful and positive life were not promising, by 2010 he was sentenced to 5 years imprisonment. By the age of 21 he was already showing signs of mental illness and depression. His medical records from Rikers island detailed his diagnosis and history of mental issues. The records also indicated that he had one prior suicide attempt while previously incarcerated[2]. The records show a young man who despite his criminality, was terrified of upstate prison, so terrified that he refused mental health assistance while in Rikers Island and when transferred upstate he was transferred without his medication in tow.

The Rikers Island records detail a young man with serious mental health issues that were never addressed prior to incarceration, and mental health issues that were only compounded by his environment, childhood and family history and his occasional use of cocaine, crack cocaine and daily use of marijuana. Ironically, prison has been the only place where Ruben's mental health needs have been addressed[3].

After his release from jail, Ruben returned to the same dysfunctional environment and the same mental health and developmental issues. However, now those issues were now compounded by the dysfunction of prison and embedded in his psyche. While out of prison, Ruben initially attempted to find employment, however with no real defined employable skill set and a history of trauma and dysfunction he resumed the only life he knew, which was "the street".

Ruben took risks that many would properly hesitate to take.  At an early age, he was broken by the harshness and trauma of life and sexual abuse.  Against that unforgiving backdrop, Ruben made all the wrong choices that culminated in his involvement in this indictment. He wrongly understood the sex trafficking business as a mechanism for him to control his battered

---

[2] New York Presyterian medical records indicate that Ruben was diagnosed with a history of depression, PTSD, and anxiety disorder. Records show he was prescribed the anti-depressant, remeron.
[3] New York City Department of Health and Mental Hygiene records from 2010 indicate that Ruben was prescribed Abilify, Depakote, and Seroquel.

narrative and to escape the deprivations of poverty and the emotional, spiritual, physical and moral trauma that attends such misery.  Cf. Bannister, 786 F. Supp.2d at 653  ("In place of steady jobs and the values and satisfactions that those jobs inculcate, low-income African Americans in urban neighborhoods are left with an economic desperation that can lead to antisocial behavior. . . . '[W]hen jobs disappear and people are left poor, highly concentrated, and hopeless, the way is paved for the underground economy to become . . . an unforgiving way of life organized around a code of violence and predatory activity.'") (citation omitted). Ruben's parents' lives and his childhood are crucial to understanding his role in the charged offense and his history and background.  In America, we have the luxury of forgetting that, in many places, just a train ride away from privilege, there are neighborhoods ruminating in deprivation for large numbers of children just like Ruben.  Children with no healthy parental contact, no formal education, and nothing kind and decent in their life except the random and inconsistent generosity of strangers. Ruben never learned to self-sooth, or develop the habits of a mind conducive to living a normal and healthy life. The more salient question considering Ruben's life, is why would he not have made the choices he did considering how much the system and society had failed him.

## V. Redemption and Sentencing

As a practical matter, the Court need not be overly concerned about the possibility of recidivism upon his possible release from imprisonment, since Ruben's mandatory minimum is ten years of imprisonment, and at a minimum he will be in his forties if sentenced to 120 months. Cf. United States v. Willis, 322 F.Supp.2d 76, 83 (D. Mass. 2004) ("The Guidelines are concerned about recidivism: What are the chances that a defendant in his mid forties would be a recidivist? The physical and mental capacity to engage in criminal activity plainly lessens as the offender gets older."). (citation omitted).

Some people may take the opinion that because of Ruben's traumatic past and admitted conduct in the indictment he is beyond redemption. To the contrary Ruben has shown remorse and reflection in all of my conversations with him, and his conversations with the mitigation specialist assigned to his case. In fact his remorse was reflected at the time of his plea efore the Court. Although none of his victims were hospitalized for any injuries resulting from Ruben's behavior, Ruben now understands the psychological damage they suffered because of their age and  the sexual abuse, since upon reflection of his own life he realizes how deeply wrong his actions were.

This case makes me think about one of my earlier trials in my career as a young prosecutor in 1999 in the Brooklyn District Attorney's office. While in the gang unit I prosecuted a young Bloods member by the name of Steven Watkins aka "Bloody Watts". Mr. Watkins had forcibly pimped and promoted prostituion from a young lady by the name of Bernadette White. Mr. Watkins' case included threatening Bernadette with violence and having sex with her. He also was apprehended while chasing her on what was known as the "track" on Flatlands avenue in East New York Brooklyn waving a loaded handgun. When arrested police recovered the handgun and a book titled "Pimp" written by Iceberg Slim. I remember vividly how Bernadette

viewed the world in such a different way than most people I knew, and how her complex trauma from childhood influenced her view of the world, making it extremely difficult to keep track of her in preparation for trial. In fact, I commenced opening statements before Judge Patricia Dimango and the jury, while detectives combed the streets looking for Bernadette. As I sat down after opening statements, one of the detectives peaked into the courtroom with the thumbs up sign letting me know that he had Bernadette in the hallway. The jury would eventually convict Steven Watkins and he was sentenced to ten years by Judge Dimango.

After I left the prosecutor's office I would see Bernadette from time to time on the street, she had seemed to get her life together. Fast forward to 2016 I was in Manhattan at a club for a friend's birthday party. After the bouncer looked at my license, he asked me to step aside and waved my other friends in. He then asked me if I knew who he was, I said no. He then said it's me, "Bloody Watts", you don't remember me do you?. I said I absolutely remembered him, how could I forget. He told me that he had been trying to find me for years and had heard about a mentoring program that I operated in my childhood neighborhood of Brownsville, Brooklyn. He told me that for years he had hated me and the judge but over time he realized how his incarceration probably saved him from death or a life of misery. He asked if me and my partners would allow him to speak to the young men in our mentoring program. We did and he spoke with humility, thoughtfulness, and dignity about his mistakes, his life, gangs and how he turned his life around. The experience was one of the most humbling experiences in my legal career. The experience reminded me that people are complex and layered, and time and space allows reflection and healing.

Ruben is capable of reflection and healing just like Steven Watkins. His plea and the remorse he has shown is the beginning of the road of redemption for him. 120 months of incarceration is a significant amount of time    for Ruben to seek redemption and reflection, as well as address his own trauma and mental health issues. In 120 months his young son will be a young adult and hopefully his mother will still be alive despite her  myriad of health issues; his neighborhood in the Bronx will no longer be recognizable, and he will have had the luxury of perspective. Additionally, this investigation has resulted in 19 individual arrest and the following sentences for similar conduct:

> a) 18 cr. 527 Ruben Sands: sentenced to 60 months.
> b) 18 cr. 527 Jermaine Myrie: sentenced to 135 months.(included violence).
> c) 18 cr. 528 Christopher Bullock: sentenced to 54 months.
> d) 18 cr. 528 Dariel raham: sentenced to 48 months.
> e) 18 cr. 528 Adrienne Roberts sentenced to 48 months.
> f) 18 cr. 529 Cimmie Wright sentenced to 51 months.
> g) 18 cr. 874 Luidji Benjamin sentenced to 204 months after trial.

A sentence of 120 months for Ruben Mocriglio would be consistent with those who are similarly charged. A guideline sentence of 360 months - life would result in a disparity in sentencing considering the sentences received by some of the defendant's after trial.  As an adult, Ruben Morciglio has had a difficult time resolving the pain of his past trauma, history of mental

illness and the pain he has caused his family, mainly his mother and his young son. His recent reflection has required him to confront his abusive and traumatic childhood, his past criminality, and the fact that he is no longer able to see after his ill mother and young son or in the near future.  Ruben has had extensive conversations with counsel and mitigation expert Conrad Lindo about his life, mother, son, siblings, and God. He informs counsel that he knows his jail sentence will be lengthy. Although lengthy, he knows that he has to use this time to get better and reflect on his life.  Reflection is something he never really did because life always moved too fast in his home and on the street and he could barely keep up without something bad happening.

First, and most significantly, the Guidelines provide no numerical value for the life circumstances that served to derail the life of Ruben Morciglio at such a young age, and certainly, by their very design, are no barometer of his potential for redemption. The Court is required, pursuant to 18 U.S.C. § 3553(a), to consider Ruben's individual background and character. A sentence of 120 months  imprisonment, is consistent with the purposes of criminal sentencing but humane. It recognizes the harm that a guideline sentence of 360 months - life would impose on Ruben's mother and son.  It also permits him to reflect on his mistakes and potential future with greater certainty and motivation, knowing that 10 years is a significant amount of time.

Ruben Morciglio requests that the Court impose a sentence at variance with the Guidelines, pursuant to its statutory authority under 18 U.S.C. §3553(a).  In this case, utilizing the numerical range of imprisonment suggested by the Guidelines offends the sentencing goals of 18 U.S.C. §3553(a), which mandates that the sentence imposed include an assessment of a defendant's individual background and history. The Guidelines sentence advocated by Probation and the Government fails to include, within its calculation, any numerical value or consideration of some of the most important factors in his life.

Similarly, the Guidelines fail to appreciate the most profound and devastating mitigation factors relevant to Ruben's childhood and upbringing in the Bronx and his family's socioeconomic history.  One could only speculate the trajectory of Ruben's life born into different circumstances and with the actual support of his mother, father and community.  Those risk factors he suffered as a child provided the backdrop to his formative years and his crisis of values that led him to criminality.  Without developed and loving familial relationships and a guiding parental relationship, Ruben turned to criminality to escape poverty.  He did what many do to escape the pathology of poverty: he followed a false and nihilistic narrative that up until his recent federal incarceration has defined his very existence.

## VI.   Conclusion

Ruben Morciglio's request for a sentence at variance with the Guidelines is based upon several mitigating factors, including (1) sexual assault, (2) family domestic violence, (3) early childhood blunt trauma to the head, (4) early childhood educational and developmental issues, (5) poverty, (6) lack of parental supervision and positive role models, (7) crime ridden environment, (8) history of mental illness, (9) that the Guidelines fail to account or provide any

numerical value for his traumatic childhood; and (10) the negative effect that a guideline sentence will have on the lives of his ailing mother and son. A guideline sentence would, most certainly, be greater than necessary considering the totality of Ruben Morciglio's life.

**Dated:** Brooklyn, New York
May 20, 2020

Respectfully submitted,

*Kenneth J. Montgomery*
Law Offices of Kenneth J. Montgomery, PLLC
198 Rogers Avenue
Brooklyn, New York 11225
(718) 403-9261
*Attorney for Ruben Morciglio*